UNITED STATES *v.* EDWARD I. PETOW & SON (No. 4534) [1]
EDWARD I. PETOW & SON *v.* UNITED STATES (No. 4535)

[1] C. A. D. 343.

United States Court of Customs and Patent Appeals, November 4, 1946

*Paul P. Rao*, Assistant Attorney General (*Richard F. Weeks* and *William J. Vitale*, special attorneys, of counsel), for the United States.
*Joseph F. Lockett* for Edward I. Petow & Son.

[Oral argument October 1, 1946, by Mr. Weeks and Mr. Lockett]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges

GARRETT, Presiding Judge, delivered the opinion of the court:

Appeal No. 4534 was taken on behalf of the Government from the judgment of the United States Customs Court, Third Division (C. D. 933), sustaining the claim of importer's protest for classification under free-list paragraph 1780 of the Tariff Act of 1930 of certain merchandise imported during November 1943, described in the court's decision

upon the basis of evidence presented, as "consisting of sea water, fish scales, seaweeds, parts of fish, and accompanying offals." It may be stated that the desired ingredients of the mixture were the scales which came from a type of fresh sea herring, described by one of importer's witnesses as English herring. The fish themselves (not involved here) were packed as sardines. It appears that guanine which is used in producing essence of pearl is recovered from the scales of such herring.

The collector's classification, with duty assessment, was made under paragraph 1558 of the act, the pertinent part of which reads:

PAR. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem  *  *  *

Paragraph 1780 reads:

PAR. 1780. Tankage, fish scrap, fish meal, cod-liver oil cake, and cod-liver oil cake meal, all the foregoing unfit for human consumption.

So far as appeal No. 4534 is concerned, the only issue involved is that between the applicability of paragraph 1558 and paragraph 1780.

However, the protest of the importer read in part as follows:

The merchandise is not dutiable as assessed but is free of duty under paragraph 1677, or 1678, or 1756, or 1780 of the said Act  *  *  *

The trial court considered each of the paragraphs enumerated in the protest and expressly held paragraphs 1677, 1678, and 1756 inapplicable, but, as has been indicated, sustained the claim under paragraph 1780, holding the merchandise to be "fish scrap unfit for human consumption." By cross-appeal, that is appeal No. 4535, the importer brings the alternative claims under paragraphs 1677, 1678, and 1756 before us to be considered in the event we find ourselves in disagreement with the classification adjudged by the trial court.

The character of the merchandise and the manner of its production and importation are well described in the decision of the trial court as follows:

*  *  *  it appears that the sea herring from which the scales are removed are taken from Canadian waters at certain suitable places in fish weirs designed especially and set up for that purpose. When the herring are confined in the weir the net lying on the sea floor inside the weir is drawn up and the fish are dipped therefrom into what are known as trap boats, being rowboats having a false bottom made of wooden slats with spaces between them. These trap boats are filled up to the gunwales with herring. In transferring from the net to the trap boat the herring shed their belly scales. These scales drop down through the slat floor to the bottom of the boats. When loaded, the row or trap boats proceed to a steamer where the herring are removed by means of a large scoop net. After delivering their cargoes of herring, the trap boats are tipped down on one end so that the material in the bottom will flow to that end, then a trap door in the floor is removed and the contents are scooped out. This material, consisting of sea water, fish scales, seaweeds, parts of fish, and accompanying offals, is then placed in a netting contraption known as a "scale saver"

which allows much of the sea water to run off. The remaining material is emptied into baskets holding 2 bushels furnished by the importer. These baskets are placed on board a power boat that proceeds directly to the plant of the plaintiff as fast as possible to prevent deterioration of the fish scales. When alongside the manufacturer's dock, a customs official is called and in his presence the baskets are hoisted to the dock and weighed by the customs official on platform scales.

The product sought from the fish scales is the glint or guanine which is peculiar to the fresh sea herring. Guanine in its natural state is found upon the herring scale where it is held in place by a film of skin. The processes at the factory removes the guanine from the scales. The scales are then discarded as scrap. Before the importing company had discovered guanine on fish scales and developed a use therefor the herring fish scales had been discarded.

The fish scales in question consisted of such as were naturally shed from the herring and were free from preservative of any sort. However, when the fresh sea herring are processed for canning at American factories, methods have been developed to separate the fish scales removed from the herring from other offal. Such scales are also sent to plaintiff for processing. The guanine on such scales is not of the quality of that on the fresh belly scales.

The evidence in the case indicates that the industry in which the herring scales are used in producing guanine is localized in a relatively small section on the coast of the State of Maine. Importer's plant is located at Lubec which is a subport of Eastport and the importations at issue were entered at Lubec. Importer appears to have begun the business in 1917, and it is stated that its process of recovering the guanine from the scales is a secret one discovered by Edward I. Petow, father of Ernest J. Petow, the present owner of the business. We understand from the record that there are others engaged in the business who make importations, and that entries have been made at Eastport and at the subport of Holeb-Jackman.

In holding the merchandise classifiable under paragraph 1780, the trial court said:

We are of the opinion that the product, as imported, illustrated by illustrative exhibit D and described as containing sea water, seaweeds, fish scales, parts of fish, and accompanying offal, is comprehended within this provision. The word "scrap" is defined in the Century Dictionary and Cyclopedia as "A small piece, properly something scraped off; a detached portion; a bit; a fragment; a remnant: as, scraps of meat. * * * the refuse of fish, as menhaden, after the oil has been expressed: * * * Green scrap, crude fish-scrap or guano, containing 50 to 60 per centum of water * * *." Bearing in mind that as imported the merchandise is something more than fish scales, it would correspond to fish scrap, under the foregoing definitions of "scrap." Being specifically enumerated, it would be classifiable under paragraph 1780 rather than paragraph 1558, and we so hold.

It is urged by counsel for the Government, in effect, that the term fish scrap as used in the paragraph does not embrace all scraps of fish, but that it is limited to the residue remaining after fish has been cooked and the oil or glue extracted therefrom.

It is pointed out that one of the definitions of "scrap" quoted in the court's decision is "the refuse of fish, as menhaden, after the oil has been expressed," and another is "Green scrap, crude fish-scrap or guano, containing 50 to 60 per centum of water," and the definition of fish-scrap given in the Century Dictionary and Cyclopedia is quoted as follows:

*fish-scrap.* Fish or fish-skins from which oil or glue has been extracted by cooking and pressing. Fish-scrap, in either a crude or a dried state, is of great commercial importance as a fertilizer. The menhaden-fishery furnishes the greater part of the supply obtained in the United States.

The Government also recites and relies upon certain legislative history in support of its position. Attention is directed to the fact that no tariff act prior to that of 1930 contained a provision corresponding to that of paragraph 1780; that the 1922 act (par. 1583) provided free admission for "Guano, basic slag * * * manures, and all other substances used chiefly for fertilizer, not specially provided for," and that the Summary of Tariff Information 1929 (prepared for use of the Committee on Ways and Means of the House of Representatives in formulating the Tariff Act of 1930) discussed materials embraced in such "other substances." Among these are "Fish Scrap and Fish Meal" of which the summary (vol. II, p. 2356) states:

*Description and uses.*—Fish meal and fish scrap (including green scrap and acidulated scrap) are manufactured from fresh fish by cooking it, extracting the oil if any is present, and draining or drying the residue according to the final product desired. The residue resulting from the cooking process is known as *green scrap* or wet scrap. Green scrap is a perishable intermediate product which is further processed unless it is intended for immediate local consumption. If the scrap is intended for shipment to near-by points a small amount of sulphuric acid is added and it is called *acidulated scrap.* Green scrap and acidulated scrap contain about 40 per cent water by weight.

The bulk of the production of green scrap is thoroughly dried and ground. The dried, ground product usually contains less than 12 per cent water by weight and is known in the trade as *fish meal.* Five tons of fresh fish will make about 2½ tons of green scrap and 2½ tons of green scrap will make about 1 ton of fish meal. The principal fish used in the manufacture of fish meal are menhaden, pilchard, herring, and sardine. Large quantities of fish meal are also made from the offal of the fish-preparing and fish-preserving industries.

Green scrap and acidulated scrap are used for fertilizer. Fish meal is used for poultry and animal feeds as well as for fertilizer. In 1927 about 65 per cent of the fish meal consumed in the United States was used for feeds and 35 per cent for fertilizer. Fish meal which is light in color, low in fat and salt, and high in protein and phosphate is in greatest demand for the feeding of animals. Some of the fish meal suitable for feeding is used for fertilizer.

Menhaden scrap averages 11 per cent ammonia and 16 per cent phosphate of lime. Acidulated scrap contains about 6 per cent ammonia and 3 per cent phosphate of lime. Waste material from fish-canning factories usually contains 7 to 9 per cent ammonia and 6 to 8 per cent phosphate of lime.

Webster's New International Dictionary, second edition, defines fishscrap as "fish pomace," and defines fish pomace as "Refuse of fish after the oil is expressed, used for fertilizer." Definitions by other lexicographers examined are in substantial accord with those quoted from Century and Webster.

Upon the basis of the dictionary definitions and in the light of the recitations quoted from the Summary of Tariff Information, counsel for the Government contend, in effect, that the fish scrap intended by Congress to be classifiable under paragraph 1780 is only that which remains as a residue after fish or fish skins have been cooked, and the oil pressed from the cooked mass.

Counsel for the importer, on the other hand, insists that the merchandise falls literally within the meaning of the first definition of scrap, quoted by the trial court, reading: "A small piece, properly something scraped off, a detached portion; a bit; a fragment; a remnant; as, scraps of meat." He also quoted from Webster's Collegiate Dictionary, fifth edition, the following:

(2) a. A small detached piece; a bit; as, a scrap of paper.
(4). sing. or pl. Scrap metal; also waste material of any kind.

It is urged that "Herring fish scales are worthless unless they are recovered and used by this and other importers engaged in the same line of business"; that the court may take judicial notice that wherever fish are cleaned or dressed, that which is left after the edible parts have been obtained "is considered 'fish scrap' "; that all parts of the fish not edible are fish scrap, and that the involved scales are in this category. With respect to the definitions and the statement of the summary it is urged, in substance, that since the industry in which importer is engaged is comparatively new, neither the lexicographers nor the Tariff Commission probably had any knowledge of it, or of the use to which scales of the kind involved had been subjected prior to the passage of the Tariff Act of 1930.

If we were convinced that fish scrap, as used in paragraph 1780, meant raw bits or raw parts obtained from fish, we should have no difficulty in agreeing that the scales were parts of the herring from which they came, and properly classifiable as held by the trial court. They would fall, we think, within the first definition quoted in that court's decision, but we are unable to escape the conclusion, particularly in view of the quoted recitations of the summary, that fish scrap, as used in the paragraph, has, for customs purposes, a more limited meaning.

As has been indicated, paragraph 1780 had no prototype in previous tariff acts and no one of the substances therein named seems to have been provided for *eo nomine* in previous acts. Besides fish scrap the paragraph provides for tankage, fish meal, cod-liver oil cake and cod-

liver oil cake meal. Each of those articles is a processed substance—not simply a raw product. Tankage, for example, is made by cooking meat scraps, bones, carcasses of animals and blood under pressure to remove most of the grease. The solid material remaining after removal of the grease is dried and ground, and the ground product is tankage. (See Summary of Tariff Information 1929, vol. II, p. 2355.) The cod-liver oil products are also processed products. Fish meal is ground fish scrap. It could not be obtained from fish or parts of fish in a raw state.

In view of the context of the paragraph, the dictionary definitions, and the statement of the summary, we think it clear that Congress contemplated that the fish scrap provided for in paragraph 1780 consisted of only that fish substance remaining after cooking the raw material and extracting the oil from it, and that the paragraph does not cover raw substances such as the scales and other offal present in the importation in controversy.

We find nothing in the publications of the Department of Agriculture and the Department of Commerce, cited by counsel for the importer, which would justify any different conclusion so far as the tariff meaning of the term as used in paragraph 1780 is concerned, nor do we think the testimony of the witness Josselyn justifies any different conclusion. In other words, it is our view that while, in a sense, the merchandise may be regarded as scraps of fish, it is not the kind of fish-scrap covered by the paragraph. Hence there must be a reversal of the court's judgment upon that phase of the controversy.

As has been stated, the importer by cross-appeal brings before us for consideration paragraphs 1677, 1678, and 1756, under each of which alternative claims were made in the protest.

All of those paragraphs are free-list paragraphs. They read as follows:

PAR. 1677. Fish imported to be used for purposes other than human consumption.

PAR. 1678. Fishskins, raw or salted.

PAR. 1756. Sea herring, smelts, and tuna fish, fresh or frozen, whether or not packed in ice, and whether or not whole.

In holding no one of those paragraphs to be applicable, the trial court said:

We are of the opinion that the refuse from the rowboats used to contain herring in transportation between the weir nets and the fishing vessel cannot be regarded as fish. The use of the noun "fish" as an adjective to describe the scales is not sufficient to bring such material within paragraph 1677. In our opinion the merchandise imported was more than fish scales; it was comprised partly of seawater and other offal of fish. Therefore, in our opinion, classification under paragraph 1678 is untenable. The specific provision in paragraph 1756 for sea herring, whether or not whole, is no more applicable to the imported product

than is paragraph 1677 for fish. That paragraph never was intended to comprehend fish refuse such as at issue here. For the reasons stated we hold that the merchandise is not classifiable under paragraph 1677, 1678, or 1756.

There is evidence to the effect that importations of merchandise of the character here involved made while the Tariff Act of 1922 was in effect were admitted duty free, classification being made under paragraph 1575 of that act which was identical with paragraph 1677 of the 1930 act.

It also appears that after the passage of the 1930 act, similar merchandise was admitted duty free until October 23, 1943, classification being sometimes under paragraph 1677, sometimes under 1678 (which provides for "Fishskins, raw or salted"), and sometimes under paragraph 1780.

On September 23, 1943, T. D. 50927 (1) was published in the weekly issue of TREASURY DECISIONS (p. 7) which, under the collector's construction of it, resulted in the classification here complained of. The pertinent part of the Treasury Decision in question reads as follows:

(1) *Herring fish scales.*—Fresh herring fish scales, washed and packed in sacks, and salt herring scales in bulk are dutiable at 10 percentum ad valorem under paragraph 1558, Tariff Act of 1930, and not free under paragraph 1677, 1678, or 1780. As this ruling will result in the assessment of duty on such merchandise at a rate higher than that formerly assessed under a uniform practice, the higher rate shall be applied to such merchandise only when entered for consumption or withdrawn from warehouse for consumption after 30 days after this abstract is published in the weekly TREASURY DECISIONS. Bureau letters to the collector of customs, Portland, Maine, July 27, 1943, and September 4, 1943. (453.65)

It appears (a matter conceded by counsel for the Government) that the fish scales here involved did not fall within the description given in the Treasury Decision—that is, they were not "washed and packed in sacks" nor were they "salt herring scales in bulk." They were *fresh* herring fish scales by which, as we understand it, was meant scales of freshly caught herring which herring had not been salted. Seemingly, however, it was thought by the deputy collector who classified the merchandise here involved that it was covered by the Treasury Decision and hence in classifying it he departed from the practice which had theretofore prevailed of classifying it under one of the free list paragraphs. In view of this situation, counsel for the importer argues that there was no legal change in the practice of classifying such fresh sea herring scales, by which, as we understand counsel's argument, is meant, that there was a failure to comply with section 315 of the Tariff Act of 1930 as amended by section 6 of the Customs Administrative Act of June 25, 1938 (U. S. C., 1934 edition, sup. V, title 19, sec. 1315), the pertinent part of which reads:

No administrative ruling resulting in the imposition of a higher rate of duty or charge than the Secretary of the Treasury shall find to have been applicable to imported merchandise under an established and uniform practice shall be effective with respect to articles entered for consumption or withdrawn from warehouse for consumption prior to the expiration of thirty days after the date of publication in the weekly Treasury Decisions of notice of such ruling; * * *

It seems to us that a complete answer to this contention of appellant is that since concededly the Treasury Decision did not cover merchandise of the character here involved, the ruling of the Secretary of the Treasury, as stated in the Treasury Decision, was not here applicable, and the classification made by the collector, even though made under a misapprehension of what the Treasury Decision covered, was not illegal simply because of such misapprehension. The Secretary of the Treasury did not, in fact, make any finding or ruling relating to the classification of fresh herring scales imported in the condition of those here involved.

Upon the basis of the evidence hereinabove alluded to, to the effect, that such importations as were made under the Tariff Act of 1922 were classified under paragraph 1575 of that act the importer here invokes the doctrine of legislative approval, of long-continued administrative practice, and, for that reason, contends for the applicability of paragraph 1677, the argument being that Congress is presumed to have known of the practice under the 1922 act and that it ratified that practice by reenacting the identical language of the provision in the 1930 act.

The Government does not concede that long-continued administrative practice has been established by the evidence. In fact, it contends to the contrary, but it also contends that even if it were established, the court would not be foreclosed from determining the question of law as to the proper classification.

All the evidence relating to classification *under the 1922 act* is embraced in the oral testimony of Mr. Arthur T. Flagg, who at the time of testifying (June 30, 1944), was a liquidator in the Customs service at Portland, Maine, where the entries at Eastport, Lubec, and Holeb-Jackman seem to have been liquidated, and had been for 14 years, or since 1930. Prior to that time and seemingly during the entire life of the 1922 tariff act, he was an inspector of customs connected with the collector's office at the ports and subports named. He was called as a witness by the importer.

It is deemed unnecessary to detail Mr. Flagg's testimony. He had full opportunity to become familiar with the classification of the merchandise under the 1922 act of which all documentary evidence seems to have been destroyed in the regular course of business many years ago. His testimony which is not questioned by Government counsel was clear and positive to the effect that all importations of

substances of the kind here involved imported under the 1922 act were classified under paragraph 1575 of the act as "Fish imported to be used for purposes other than human consumption."

It should be borne in mind that the industry of recovering guanine from herring fish scales was then new, and importations of the scales were not numerous.

His testimony respecting classification under the 1930 act was equally clear and positive to the effect that the importations under that act up until October 23, 1943 (the several importations here involved were entered from November 16 to November 29, 1943, inclusive), were admitted duty free, being classified under either paragraph 1677, or 1678, or 1780, seemingly depending upon the view of the particular deputy collector who passed upon a particular importation. There is documentary evidence from the files of the collector substantiating parts of his oral testimony. Other records had been destroyed in the regular course of business. There does not seem to have been any classification under either paragraph 1656 of the 1922 act or the similar paragraph (1756) of the 1930 act.

Upon the point now being considered, we are interested only in the practice under the 1922 act.

It is true, as often has been stated (decisions in point being the cases of *Bache & Co.* v. *United States*, 11 Ct. Cust. Appls. 314, T. D. 39129, and *United States* v. *H. Bayersdorfer & Co.*, 16 Ct. Cust. Appls. 43, T. D. 42717, and cases therein cited) that it is a well-known rule of construction in customs law that the reenactment of a statute implies an approval by Congress of a long-established administrative practice under it where satisfactory proof of such practice is made, and that in the classification of merchandise under the tariff acts such rule is regarded with favor by the courts.

However, like all rules of construction, long-established administrative practice is not necessarily conclusive as to the construction or application of a statute particularly where, as in this case, the matter of its construction or application arises before the courts for the first time. See *Rapken & Co., Ltd.* v. *United States*, 25 C. C. P. A. (Customs) 268, T. D. 49393, where, *inter alia*, we said:

* * * long-continued administrative practice may aid in the interpretation of tariff statutes, but it does not preclude the courts from construing or interpreting a statute contrary to such practice when an issue as to its interpretation is presented for the first time.

We have dwelt at some length upon the matter of administrative practice because of the emphasis placed upon it by counsel for the importer in his brief and in oral argument before us.

We do not think that upon the facts presented by the record in this case it properly may be held that the classification of the involved

merchandise should be governed solely by the practice pursued under the Tariff Act of 1922. So far as the practice under the Tariff Act of 1930 is concerned, it obviously was not uniform as to paragraphs, although in every instance until October 23, 1943, classification was made under a free-list paragraph.

We think, however, that paragraph 1677 should be considered on the merits. The trial court's reason for holding it inapplicable is not altogether clear to us, but apparently it was of opinion that the refuse, accumulated in the rowboats used in transporting the herring from the weir nets to the fishing vessel, cannot be regarded as fish. Just why it may not be so regarded is not stated other than such inference as may be drawn from the statement, "The use of the noun 'fish' as an adjective to describe the scales is not sufficient to bring such material within paragraph 1677." Whether or not it was the court's view that the paragraph contemplated only whole fish as being within its terms we are unable to determine.

Our own view is that the meaning of fish as used in the paragraph was not intended to be so limited. The paragraph is one of the few paragraphs in the act which makes classification dependent upon the purpose for which imported. (Another example is found in the case of certain leather. See paragraph 1530 (c) of the Tariff Act of 1930.) Only that fish which are imported for purposes other than human consumption are entitled to classification under the paragraph. If the same fish be imported for the purpose of being consumed by humans it would take some other classification.

The Summary of Tariff Information 1929, volume II, page 2330, discussing paragraph 1575 of the 1922 act (of which, as has been stated, paragraph 1677 of the 1930 act is an exact copy) states:

*Description and uses.*—Fish, for purposes other than human consumption, are mainly bait fish used in the commercial fisheries, ornamental fish, and fish used in the manufacture of oil, meal, and fertilizer. Herring is the principal bait fish, and live goldfish * * * the principal ornamental fish. *Fish offal* and whole fish such as herring, pilchard, menhaden, and dogfish are used in the manufacture of oil, meal, and fertilizer. [Italics supplied.]

Under the subheading of "Imports" (p. 2331) the summary states, *inter alia,* "Fish and fish *offal,* used for reduction purposes are imported into Maine," and under the subheading of "Prices," that "The prices of fish for purposes other than human consumption in 1928 were as follows: * * * *fish offal* in Maine, $12 per ton." [Italics supplied.]

Also, under the heading of DECISIONS (p. 2332), it was stated, in substance (C. I. E. 583 being cited), that "*Fresh cod livers in alcohol,* for use in the manufacture of a tasteless extract of cod livers," was

classified under paragraph 1575, "it not being regarded as an article of food."

In the light of these statements, it would seem clear that it was not the intention of Congress that paragraph 1677, *supra*, be limited to whole fish. It is a matter of common knowledge of which we may take judicial notice that the inedible waste or offal resulting from dressing fish, for canning, etc., is used in making fish scrap. There is undisputed testimony in the instant case that the fish from which scales, such as those involved are obtained, are packed as sardines, and that in preparing them for packing there are waste parts, such as the fins, skins, and entrails which are salvaged and used in making fish scrap. Incidentally, it appears that the scales taken from the herring at the canning plants are sometimes purchased and used in importer's guanine industry, but, seemingly, they are not as desirable as the fresher scales which fall off in the rowboats.

While it appears that fish used for bait and ornamental fish are the principal kind imported "for purposes other than human consumption," there is nothing in the clause which limits the application of paragraph 1677 to those kinds, nor is the particular purpose for which the fish are imported of any importance in the matter of classification, so long as they are not to be used for human consumption.

During the taking of the testimony a sample representative of the merchandise in its imported condition was introduced in evidence as an exhibit. It was perishable and could not be satisfactorily preserved. Indeed, the stuff deteriorates rapidly and it is necessary to land the scales at the plant where the guanine is recovered very soon after the removal of the herring from the weir, or else they become worthless for importer's purpose. It was agreed by counsel for the respective parties that a fresh sample might be placed before this court as evidence to be inspected and considered for whatever it may be worth, and that was done, the sample being brought from Maine by airplane.

An inspection of the sample shows, in addition to the scales, pieces of fish and whole fish which became commingled with the other substances, which pieces and whole fish undoubtedly were of a class suitable for use in making fertilizer, had it been desired to so use them. It was offal, evidently of the kind embraced in that term as used in the summary hereinabove quoted. There seems to be no question but that the term "offal" applies to the scales which constituted the particular substance the importer desired, as well as to the pieces of fish. They, of course, were imported to be used for purposes other than human consumption. They are not themselves so used, nor is the product made from them so used.

We have given some consideration to the importer's claim under paragraphs 1678 and 1756, respectively. Importer's arguments as to

their applicability are plausible, but, upon the whole, the substance seems to us to fall more specifically within the meaning of paragraph 1677 than it does within that of any other paragraph involved, or brought to our attention, and, therefore, we hold it classifiable under that paragraph and direct that the duties collected from the importer be refunded.

The judgment of the United States Customs Court involved in appeal No. 4534 is *reversed*.

Also, the judgment involved in the appeal of the importer, that is appeal No. 4535, is *reversed* so far as it denied the claim of the importer's protest for classification under paragraph 1677, *supra*, and the case is *remanded* for further proceedings in conformity with the views herein expressed.